Michael A. Sirignano, Esq.
Barry I. Levy, Esq.
Priscilla D. Kam, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees*
*Insurance Company, GEICO Indemnity Company,*
*GEICO General Insurance Company and*
*GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,                                                                      Docket No.

                           Plaintiffs,

            -against-


REGO PARK PHARMACY LLC,
ARTUR KHAIMOV a/k/a ARTHUR KHAIMOV,
PATRICIA KELLY, D.O.
a/k/a PATRICIA KELLY, M.D., and
JOHN DOE DEFENDANTS "1" THROUGH "10,"

                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## <u>COMPLAINT</u>

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively, "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants, Rego Park Pharmacy LLC, Artur

Khaimov, a/k/a Arthur Khaimov, Patricia Kelly, D.O. a/k/a Patricia Kelly, M.D., and John Doe

Defendants "1" through "10" (collectively, the "Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1.       This action seeks to terminate a fraudulent scheme perpetrated against GEICO by the Defendants who have exploited the New York "No-Fault" insurance system by submitting more than $1,814,300.00 in fraudulent pharmacy billing to GEICO. Specifically, the Defendants submitted, or caused to be submitted, thousands of fraudulent charges to GEICO seeking payment for a set of specifically targeted, medically unnecessary "pain relieving" topical prescription drug products, primarily in the form of Lidocaine 5% Ointment, Lidocaine 5% Patches (collectively, the "Fraudulent Topical Pain Products"), in addition to a limited assortment of topical and oral nonsteroidal anti-inflammatory drugs ("NSAIDs") and muscle relaxants (together with the Fraudulent Topical Pain Products, the "Fraudulent Pharmaceuticals").

2.       Defendant Artur Khaimov ("Khaimov"), who purports to solely own Rego Park Pharmacy LLC ("Rego Park Pharmacy") (collectively, the "Pharmacy Defendants"), used Rego Park Pharmacy to dispense the Fraudulent Pharmaceuticals to individuals involved in automobile accidents and eligible for insurance coverage on policies of insurance issued by GEICO (the "Insureds"). In order to exploit the Insureds for financial gain, the Pharmacy Defendants targeted the prescription and dispensing of the Fraudulent Pharmaceuticals in place of other effective – but much less costly – prescription and non-prescription drug products because the Pharmacy Defendants were able to acquire the Fraudulent Pharmaceuticals at low cost and then dispense and bill for them at egregious prices.

3.       In furtherance of the fraudulent scheme, the Pharmacy Defendants entered into illegal, collusive financial agreements with prescribing healthcare providers (the "Prescribing Providers") including Defendant Patricia Kelly, D.O. a/k/a Patricia Kelly, M.D. ("Dr. Kelly"), and unlicensed laypersons (the "Clinic Controllers") who work at or are associated with various multidisciplinary medical clinics that virtually exclusively treat No-Fault patients (the "No-Fault

Clinics" or "Clinics"). Pursuant to these illegal financial arrangements, the Pharmacy Defendants paid kickbacks to the Prescribing Providers and/or the Clinic Controllers in exchange for large volumes of predetermined, protocol prescriptions for the Fraudulent Pharmaceuticals to be directed to Rego Park Pharmacy.

4. The Pharmacy Defendants intentionally dispensed the Fraudulent Pharmaceuticals – with no regard to genuine patient care – solely to financially enrich themselves through egregiously inflated charges submitted to GEICO. For example, billing from Rego Park Pharmacy for the Fraudulent Topical Pain Products typically ranged from: (i) $1,224.04 to $1,528.80 for a single tube of Lidocaine 5% Ointment and (iii) $229.64 to $678.92 for a prescription of Lidocaine 5% Patches.

5. The Defendants' actions also posed serious risks to patient health, as the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined treatment protocols without regard to genuine patient care, and without regard to proper documentation or with documentation that was inconsistent with the pharmaceutical products actually prescribed and dispensed.

6. By this action, GEICO seeks to recover more than $447,829.00 that the Pharmacy Defendants stole from it, along with a declaration that GEICO is not legally obligated to reimburse Rego Park Pharmacy for any pending fraudulent No-Fault claims that the Pharmacy Defendants submitted or caused to be submitted through Rego Park Pharmacy, amounting to more than $750,996.00 in pending claims, because:

     (i)     The Pharmacy Defendants billed for pharmaceutical products that were medically unnecessary and were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit patients for financial gain, without regard to genuine patient care;

(ii)     the Defendants participated in illegal, collusive relationships in which the Pharmacy Defendants steered Dr. Kelly, the other Prescribing Providers, and the Clinic Controllers to prescribe the Fraudulent Pharmaceuticals and then direct the prescriptions to Rego Park Pharmacy in exchange for unlawful kickbacks and other financial incentives;

(iii)    the Pharmacy Defendants intentionally targeted a specific set of pharmaceutical products (*i.e.*, the Fraudulent Topical Pain Products) that they acquired at low cost and, through Rego Park Pharmacy, dispensed in large volumes to Insureds at exorbitant charges, in place of other effective, less costly pharmaceuticals in order to inflate the charges submitted to GEICO; and

(iv)    the Pharmacy Defendants made false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals dispensed by Rego Park Pharmacy pursuant to illegal and duplicitous prescriptions.

7.     The Defendants fall into the following categories:

(i)     Rego Park Pharmacy is a New York corporation engaged in a fraudulent scheme in which it dispensed the Fraudulent Pharmaceuticals pursuant to illegal, collusive financial agreements and predetermined protocols without regard to genuine patient care, in order to submit to GEICO and other New York automobile insurers claims for reimbursement of No-Fault Benefits to which it is not entitled;

(ii)    Khaimov is the record owner of Rego Park Pharmacy;

(iii)   Dr. Kelly is a Prescribing Provider who, pursuant to the illegal, collusive financial agreements and predetermined protocols, issued prescriptions accounting for approximately 96% of the billing for the Fraudulent Pharmaceuticals submitted to GEICO through Rego Park Pharmacy as part of the fraudulent scheme; and

(iv)    John Doe Defendants "1" through "10" are the Clinic Controllers, whose identities are not yet known to GEICO, and who participated in the implementation and facilitation of the predetermined protocols and the illegal, collusive agreements with the Pharmacy Defendants, Dr. Kelly, and other Prescribing Providers.

8.     The Defendants' scheme began in late 2018 and continues uninterrupted through the present day as the Pharmacy Defendants continue to seek collection on their fraudulent billing.

9.      As discussed more fully below, the Defendants at all times have known that: (i) Rego Park Pharmacy billed for pharmaceutical products that were medically unnecessary and were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit patients for financial gain without regard to genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Pharmacy Defendants steered Dr. Kelly, the other Prescribing Providers, and the Clinic Controllers to prescribe the Fraudulent Pharmaceuticals and then direct the prescriptions to Rego Park Pharmacy in exchange for unlawful kickbacks and other financial incentives; (iii) the Pharmacy Defendants intentionally targeted a specific set of pharmaceutical products (*i.e.*, the Fraudulent Topical Pain Products) that they acquired at low cost and, through Rego Park Pharmacy, dispensed in large volumes to Insureds at exorbitant prices, in place of other effective, less costly pharmaceuticals in order to inflate the charges submitted to GEICO; and (iv) the Pharmacy Defendants made false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals dispensed by Rego Park Pharmacy pursuant to illegal and duplicitous prescriptions.

10.      Based on the foregoing, Rego Park Pharmacy does not now have – and has never had – any right to be compensated for the Fraudulent Pharmaceuticals purportedly dispensed to GEICO Insureds.

11.      The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to date which the Defendants submitted, or caused to be submitted, to GEICO through the United States mail. As a result of the Defendants' scheme, GEICO has incurred damages of approximately $447,829.00.

## THE PARTIES

I.  **Plaintiffs**

12.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

II.  **Defendants**

13.     Defendant Rego Park Pharmacy is a New York limited liability corporation, incorporated on or about August 23, 2017, with its principal place of business at 66-01 Saunders Street, Rego Park, New York 11374-4635.

14.     Defendant Khaimov resides in and is a citizen of New York. Khaimov is the sole record owner and sole member of Rego Park Pharmacy.

15.     Rego Park Pharmacy and Khaimov knowingly submitted fraudulent claims to GEICO and continue to seek reimbursement on unpaid fraudulent claims.

16.     Defendant Dr. Kelly resides in and is a citizen of New York. Dr. Kelly is a Prescribing Provider who, while working for Metro Pain Specialists Professional Corporation ("Metro Pain") and Tri-borough NY Medical Practice, P.C. ("Tri-borough"), issued prescriptions accounting for approximately 96% of the fraudulent claims submitted to GEICO by Rego Park Pharmacy and Khaimov.

17.     John Doe Defendants "1" through "10" reside in and are citizens of New York. John Doe Defendants "1" through "10" are the Clinic Controllers, whose identities are not yet known to GEICO, and who participated in the implementation and facilitation of the predetermined protocols and the illegal, collusive agreements with Dr. Kelly and the other Prescribing Providers, wherein they prescribed, or purported to prescribe, the Fraudulent

Pharmaceuticals in exchange for kickbacks and other financial incentives from the Pharmacy Defendants.

### III. Metro Pain Specialists Professional Corporation and Tri-borough NY Medical Practice, P.C.

18.     Although not named as Defendants in this Complaint, Metro Pain Specialists Professional Corporation ("Metro Pain") and Tri-borough NY Medical Practice, P.C. ("Tri-borough") are entities relevant to this action.

19.     Metro Pain is a medical professional corporation, incorporated in New York on or about March 13, 2012. Metro Pain is owned on paper by Leonid Shapiro.

20.     Tri-borough is a medical professional corporation, incorporated in New York on or about August 14, 2020. Tri-borough is owned on paper by Leonid Shapiro.

21.     Dr. Kelly – a named Defendant in this action and a Prescribing Provider whose prescriptions for the Fraudulent Pharmaceuticals comprised 96% of the Pharmacy Defendants' fraudulent billing to GEICO – issued the prescriptions to be filled by Rego Park Pharmacy while working for Metro Pain and Tri-borough.

22.     Metro Pain and its employees are no stranger to fraudulent schemes. In fact, Metro Pain has been a named defendant in multiple affirmative fraud cases involving its fraudulent billing of healthcare services to several No-Fault insurers, including in State Farm Mut. Ins. Co. v. Metro Pain Specialists, P.C., et al, 21-cv-05523 (E.D.N.Y. 10/5/2021) and Allstate Ins. Co. v. Metro Pain Specialists P.C., et al., 21-cv-05586 -DG-RER (E.D.N.Y. 10/7/2021) (together, the "Metro Pain Cases").

23.     Additionally, the medical clinic from which Metro Pain and Tri-borough primarily operated in this case – and from which Dr. Kelly issued the majority of the fraudulent prescriptions filled by Rego Park Pharmacy – located at 204-12 Hillside Avenue in Hollis, New York (the

"Hillside Avenue Clinic") -- was one of numerous medical clinics confirmed in government affidavits filed in support of surveillance warrants in United States of America v. Anthony Rose, et al., 19-cr-00789 (PGG) (S.D.N.Y.) ("USA v. Rose") as being controlled by unlicensed laypersons and receiving patients as the result of illegal kickback and referral arrangements.

24.     In USA v. Rose, numerous individuals were indicted in November 2019 for paying bribes to 911 operators, medical personnel, NYPD officers, and others in exchange for confidential patient information. To exploit the patient information, Anthony Rose ("Rose"), the ringleader of the scheme, set up a fully staffed call center to contact the patients and to steer them to a "preferred" network of medical clinics in New York and New Jersey.  The medical clinics – specifically including the Hillside Avenue Clinic from where Metro Pain, Tri-borough, and Dr. Kelly primarily operated in this case – were deemed preferred because the clinic controllers paid Rose kickbacks in exchange for the patient referrals. What is more, Ana Rivera, *an employee of Metro Pain*, upon information and belief, was one of the individuals indicted in USA v. Rose for her participation in steering patients to the preferred medical clinics pursuant to the "pay-to-play" arrangements.

25.     In keeping with Metro Pain's involvement in fraudulent schemes like those alleged in the Metro Pain Cases and USA v. Rose, William Elton, M.D. ("Dr. Elton"), who worked at Metro Pain from approximately 2018 through December 2020, stated under oath that (i)  as a condition of his continued employment with Metro Pain, he was required to order medically unnecessary, expensive urine drug tests for every patient that treated at Metro Pain and (ii) he resigned from Metro Pain after discovering that Metro Pain was issuing prescriptions for compound pain creams under his name without his knowledge or authority.

26.     In this case, of approximately 407 patients purportedly treated and prescribed pharmaceutical products by Dr. Kelly at Metro Pain or Tri-borough, 400 of them – or approximately 98% – were prescribed one or more of the Fraudulent Topical Pain Products.

27.     Presumably in response to the Metro Pain Cases and <u>USA v. Rose</u>, Metro Pain and Tri-borough abruptly ceased operating from the Hillside Avenue Clinic on or about March 2022. What is more, Dr. Kelly abruptly ceased issuing prescriptions through Metro Pain for Rego Park Pharmacy beginning on or about April 29, 2021, and subsequently issued prescriptions sent to Rego Park Pharmacy solely through Tri-borough.

## JURISDICTION AND VENUE

28.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and is between citizens of different states.

29.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because they arise under the laws of the United States.

30.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

31.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities framing the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.   An Overview of New York's No-Fault Laws

32.    GEICO underwrites automobile insurance in the State of New York.

33.    New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65 et seq.) (collectively, the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

34.    No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

35.    The No-Fault Laws limit reimbursement for benefits to prescription drugs only. Over-the-counter ("OTC") drugs and products which may be purchased without a prescription are not covered expenses under the No-Fault Laws.

36.    An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or more commonly, as an "NF-3"). In the alternative, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

37.     Pursuant to New York's No-Fault Laws (11 N.Y.C.R.R. § 65-3.16(a)(12)), a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet any applicable New York state or local licensing requirement necessary to perform such services in New York.

38.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local dispensing requirement necessary to perform such service in New York … (emphasis added).

39.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed providers may practice a profession in New York because of the concern that unlicensed persons are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient.".

40.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     An Overview of Applicable Licensing Requirements

41.     Pursuant to New York Education Law § 6808, no person, firm, corporation or association shall possess drugs, prescriptions or poisons for the purpose of compounding, dispensing, retailing, wholesaling or manufacturing, or shall offer drugs, prescriptions or poisons

for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer or outsourcing facility.

42.     Pursuant to 8 N.Y.C.R.R. § 29.1, pharmacies in New York are prohibited from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party."

43.     Similarly, 8 N.Y.C.R.R. § 29.1 prohibits pharmacies from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client in connection with the performance of professional services."

44.     Pursuant to 8 N.Y.C.R.R. § 63.1(7), pharmacists shall conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to therapeutic duplication, drug-drug interactions, including serious interactions with OTC drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

45.     Pursuant to New York Education Law § 6808(e), pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

46.     Pursuant to New York Education Law § 6808(e), pharmacy owners are responsible "for the strength, quality, purity and the labeling thereof of all drugs, toxic substances, devices and cosmetics, dispensed or sold, subject to the guaranty provisions of this article and the public health law."

47.     New York Education Law § 6810 prohibits pharmacies from dispensing pharmaceuticals when a prescription form for a drug includes any other drug. Separate prescriptions are required for each drug prescribed and dispensed.

48.      New York Education Law § 6810 prohibits persons and corporations not licensed to issue a prescription, to willfully cause prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

49.     Pursuant to Education Law § 6512, §6530(11), (18), and (19), aiding and abetting an unlicensed person to practice a profession, offering any fee or consideration to a third party for the referral of a patient, and permitting any person not authorized to practice medicine to share in the fees for professional services is considered a crime and/or professional misconduct.

50.     New York Education Law § 6530(17) prohibits a physician from "exercising undue influence" on the patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party.

51.     New York Education Law § 6530(18) prohibits a physician from "directly or indirectly" offering, giving, soliciting, receiving or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

52.     New York Education Law § 6509-a prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting or refunding of a fee in connection with professional care or services related to drugs and/or medications.

### III.    The Defendants' Fraudulent Scheme Involving the Fraudulent Pharmaceuticals

#### A.    Overview of the Scheme

53.    Beginning in late 2018, and continuing uninterrupted through the present day, the Defendants masterminded and implemented a fraudulent scheme in which they exploited patients for financial gain and submitted, or aided and abetted the submission of, millions of dollars in billing to GEICO and the New York automobile insurance industry for inflated charges relating to the Fraudulent Pharmaceuticals purportedly dispensed by Rego Park Pharmacy to insureds.

54.    Rego Park Pharmacy purports to be a storefront neighborhood pharmacy operating in Rego Park, Queens, but instead operates as part of large-scale fraudulent scheme that exploited GEICO's Insureds, as well as insureds of other New York automobile insurers, through the prescribing and dispensing of the Fraudulent Pharmaceuticals, while intentionally ignoring a vast array of other pharmaceutical products, including OTC medications readily available at a fraction of the cost.

55.    Unlike legitimate pharmacies dispensing a variety of pharmaceutical products, Rego Park Pharmacy's business is intentionally targeted to dispense a limited set of pharmaceutical products (*i.e.*, the Fraudulent Topical Pain Products).

56.    Rego Park Pharmacy's charges for the Fraudulent Topical Pain Products have amounted to approximately 93% of all of the fraudulent claims that the Pharmacy Defendants have submitted to GEICO for reimbursement and has resulted in billing to GEICO alone of over $1,647,000.00.  The remaining billing submitted by Rego Park Pharmacy was primarily for a limited set of oral pain-relieving medications, including NSAIDs and muscle relaxants, as part of the scheme to defraud GEICO.

57.     The Pharmacy Defendants intentionally targeted the Fraudulent Topical Pain Products because they knew that (i) similar OTC drugs that could be recommended to Insureds were not covered expenses under the No-Fault Laws; and (ii) they could acquire the Fraudulent Topical Pain Products at a low cost and submit claims for reimbursement under the No-Fault Laws at exorbitant prices.

58.     In furtherance of the fraudulent scheme, the Pharmacy Defendants entered into illegal, collusive financial agreements with Dr. Kelly, other Prescribing Providers, and the Clinic Controllers to steer them into prescribing and directing large volumes of predetermined prescriptions to Rego Park Pharmacy for the targeted set of Fraudulent Topical Pain Products, under the guise of treating patients at the various No-Fault Clinics with which the Prescribing Providers and Clinic Controllers are associated.

59.     Rego Park Pharmacy, in exchange for the payment of kickbacks, received medically unnecessary prescriptions from Dr. Kelly, other Prescribing Providers, and the Clinic Controllers at the No-Fault Clinics pursuant to predetermined protocols.

60.     Many of the No-Fault Clinics where the prescriptions originated and were steered to Rego Park Pharmacy presented themselves to be legitimate healthcare practices when, in fact, they were multidisciplinary medical mills that housed a "revolving door" of numerous purported healthcare providers geared towards exploiting New York's No-Fault insurance system. These No-Fault Clinics exist for the purpose of subjecting insureds to as many healthcare goods and services as possible in order to exploit their No-Fault Benefits by submitting large volumes of fraudulent claims to No-Fault insurers such as GEICO for reimbursement.

61.     Rego Park Pharmacy received large volumes of medically unnecessary prescriptions from Dr. Kelly, other Prescribing Providers, and the Clinic Controllers at the No-

Fault Clinics almost immediately after Rego Park Pharmacy became registered to operate, despite the fact that Rego Park Pharmacy was a new pharmacy, Khaimov was only recently licensed as a pharmacist, and it had no reputation or track record in the pharmacy industry.

62.     The Pharmacy Defendants obtained large volumes of medically unnecessary prescriptions from Dr. Kelly, other Prescribing Providers, and the Clinic Controllers at the No-Fault Clinics pursuant to predetermined protocols, in exchange for the payment of kickbacks or other financial incentives, and without regard to genuine patient care.

63.     In keeping with the fact that the Pharmacy Defendants obtained large volumes of medically unnecessary prescriptions from Dr. Kelly, other Prescribing Providers, and the Clinic Controllers at the No-Fault Clinics pursuant to predetermined protocols, in exchange for the payment of kickbacks or other financial incentives, Dr. Kelly routinely wrote prescriptions for nearly all Insureds she treated for the types of the Fraudulent Pharmaceuticals specifically targeted and dispensed by Rego Park Pharmacy, without regard to genuine patient care.

64.     But for the Defendants' illegal, collusive agreements between the Pharmacy Defendants, Dr. Kelly, other Prescribing Providers, and the Clinic Controllers, it is extremely improbable that such a significant proportion of Insureds would have been prescribed pharmaceutical products specifically targeted and dispensed by Rego Park Pharmacy when there were similar, less costly OTC drugs or other pharmaceutical products that could have been recommended to the Insureds.

65.     Instead, Dr. Kelly, other Prescribing Providers, and the Clinic Controllers issued or caused prescriptions to be issued for the Fraudulent Pharmaceuticals specifically targeted and dispensed by Rego Park Pharmacy in protocol fashion, without regard for the similar OTC drugs or other pharmaceutical products that could have been recommended and without documenting

whether the Fraudulent Pharmaceuticals were received the patient, used by the patient, or provided any patient relief.

66.     In further keeping with the fact that the Pharmacy Defendants illegally steered Dr. Kelly, other Prescribing Providers, and the Clinic Controllers at the No-Fault Clinics to provide Rego Park Pharmacy with prescriptions for the Fraudulent Pharmaceuticals pursuant to predetermined fraudulent protocols, Insureds were never given the option to use a pharmacy of their choosing.

67.     The Pharmacy Defendants ensured that Dr. Kelly, other Prescribing Providers, and the Clinic Controllers directed the prescriptions for the Fraudulent Pharmaceuticals to Rego Park Pharmacy, regardless of: (i) the distance of Rego Park Pharmacy to the Insureds' individual residences or the No-Fault Clinics where the Insureds were receiving treatment; and (ii) the fact that there were countless other pharmacies located much closer to the Insureds' individual residences and the No-Fault Clinics where the Insureds were receiving treatment.

68.     Notably, of the Insureds who purportedly received pharmaceuticals dispensed by Rego Park Pharmacy, nearly 40% lived outside of Queens, New York, where the pharmacy is located, with residences scattered throughout Brooklyn, Bronx, Manhattan, Staten Island, and Long Island, including Nassau County and Suffolk County.

69.     In some instances, the Insureds' individual residences were located in states outside of New York, including in New Jersey and Connecticut.

70.     In most cases, Rego Park Pharmacy either purported to deliver the Fraudulent Pharmaceuticals directly to the Insureds' homes or the Fraudulent Pharmaceuticals were given to Insureds by the front desk staff at the various No-Fault Clinics without the Insureds ever seeing the prescriptions.

71. But for the Defendants' illegal, collusive financial agreements, these Insureds would not have received pharmaceutical products from a pharmacy that is located in a county or city outside of their individual places of residence.

72. Instead, Dr. Kelly, other Prescribing Providers, and the Clinic Controllers directed prescriptions for the Fraudulent Pharmaceuticals to Rego Park Pharmacy, notwithstanding its inconvenient location to the Insureds' individual residences because the prescriptions were being issued pursuant to illegal, collusive agreements between and among the Pharmacy Defendants, Dr. Kelly, other Prescribing Providers, and the Clinic Controllers.

73. The Pharmacy Defendants used the prescriptions obtained from the No-Fault Clinics to bill GEICO and other insurers millions of dollars for the Fraudulent Pharmaceuticals.

74. The Pharmacy Defendants billed GEICO more than $1.8 million, with more than $1.6 million of that billing attributable to prescriptions purportedly issued by Dr. Kelly.

75. The overwhelming portion of the Pharmacy Defendants' billing was for the Fraudulent Topical Pain Products -- specifically Lidocaine 5% Ointment and Lidocaine 5% Patches, along with some Diclofenac Gel 3% and Solutions.

76. Not surprisingly, the Office of the Inspector General of the U.S. Department of Health and Human Services noted that Lidocaine and Diclofenac and have been two of the most common products subject to fraud and abuse by pharmacies with questionable billing. See Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018). This report also noted that many pharmacies in New York State are among the most questionable in the nation.

77. Further to their fraudulent scheme, the Pharmacy Defendants continue to pursue collection on the fraudulent charges submitted to GEICO by Rego Park Pharmacy through

numerous, separate No-Fault arbitration proceedings seeking recovery on the individual fraudulent bills, which proceedings may continue for years.

78.     The Pharmacy Defendants' continued collection efforts through numerous, separate No-Fault arbitration proceedings is an essential part of their fraudulent scheme because they know it is impractical for an arbitrator in a single no-fault arbitration proceeding, typically involving a single bill, to uncover or address the Defendants' large scale, complex fraud scheme involving the prescription and dispensing of fraudulent pharmaceuticals to hundreds of patients across numerous different No-Fault Clinics located throughout the New York metropolitan area.

79.     The Pharmacy Defendants masterminded and implemented their pharmaceutical fraud scheme and recruited Dr. Kelly, other Prescribing Providers, and the Clinic Controllers as willing participants, knowing that: (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined protocols designed to exploit the patients for financial gain, without regard to genuine patient care; (ii) the Fraudulent Pharmaceuticals were the product of illegal, collusive agreements intended to inflate the billing from Rego Park Pharmacy to No-Fault insurers and financially enrich the Defendants; (iii) the Pharmacy Defendants intentionally targeted a specific set of pharmaceutical products that they acquired at low cost and dispensed in large volumes to Insureds through Rego Park Pharmacy at exorbitant charges; and (iv) the Fraudulent Pharmaceuticals were prescribed and dispensed without regard to genuine patient care or for the availability of a wide range of other prescription and OTC medications proven to have therapeutic effects and available at a fraction of the cost.

**B.     The Fraudulent Pharmaceuticals Were Prescribed and Dispensed Without Regard to Genuine Patient Care to Exploit Patients for Financial Gain**

80.     In basic terms, the goal of medical treatment is to help patients get better in a timely manner. Notwithstanding this basic goal, Insureds treated by Dr. Kelly and the other Prescribing

Providers at No-Fault Clinics associated with the Clinic Controllers – and who received pharmaceuticals from Rego Park Pharmacy – were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which completely lacked in individualized care and failed to utilize evidence-based medical practices with the goal of the Insureds' timely return to good health.

81.     Evidence-based best practices guidelines for the treatment of acute and chronic pain do exist and should always guide prescribing habits. For example, the World Health Organization ("WHO") pain relief ladder recommends a non-opioid such as acetaminophen or an NSAID for the initial management of pain. NSAIDs are the most commonly prescribed analgesic medications worldwide, and their efficacy for treating acute pain has been well demonstrated. If pain relief is not achieved, and doses are maximized, then an adjuvant oral agent may be added to the medical regiment – including the use of muscle relaxants and medications that block neuropathic pain transmission. Finally, opiates may be prescribed for short-term, limited use.

82.     Clinical studies of FDA-approved topical NSAIDs have shown that they are no more effective than a placebo for treating acute pain (*e.g.*, from strains, sprains, contusions, or overuse injuries) in superficial locations.

83.     More recently, in 2019, the Department of Health & Human Services ("DHHS") issued a Pain Management Best Practices Inter-Agency Task Force Report which focused on pain management and the treatment of acute and chronic pain. According to the DHHS report, such pain should be treated using an *individualized, multimodal approach which may include prescription medications depending on various biological, psychological, and social factors of an individual patient*, including, but not limited to, a patient's age, medical history, pain tolerance, genetics and neurological factors, stress level, coping ability, social support, and even education

and cultural factors. A risk-benefit analysis should be applied to each patient prior to determining whether a medication is clinically appropriate. Like the WHO pain relief ladder, the DHHS report indicates that non-opioids (*e.g.*, NSAIDs) should be used as first line therapy in conjunction with other conservative therapies for patients for whom medications are clinically appropriate.

84.     Despite these guidelines and the basic goal of helping patients recover in a timely fashion, Dr. Kelly and the other Prescribing Providers produced generic, preprinted, and boilerplate examination reports designed to justify continued, voluminous and excessive healthcare services that the healthcare providers at the various No-Fault Clinics purported to render to Insureds as part of a predetermined protocol that failed to include any individualized treatment whatsoever. These healthcare services included the prescription of excessive and medically unnecessary pharmaceutical drug products such as the Fraudulent Pharmaceuticals dispensed by Rego Park Pharmacy.

85.     To the extent any examination was actually performed at all, Dr. Kelly and the other Prescribing Providers: (i) often failed to document a detailed medical history of the patients to whom they prescribed the Fraudulent Pharmaceuticals; or (ii) often inaccurately documented the patients' medical histories, including any current medications the patients were taking at the time of the examination.

86.     Prescribing a multitude of pharmaceutical drug products without first taking a detailed and accurate patient history demonstrates a gross indifference to patient health and safety as Dr. Kelly and the other Prescribing Providers often did not know whether the patient was taking any medication or suffering from any comorbidity that would contraindicate the use of a particular prescribed pharmaceutical product.

87.     Notwithstanding their creation of examination reports, Dr. Kelly's prescriptions and the other Prescribing Providers' prescriptions for the Fraudulent Pharmaceuticals dispensed by Rego Park Pharmacy were based on predetermined protocols designed to exploit the Insureds for financial gain, without regard to the genuine clinical needs of the patients.

88.     In keeping with the fact that Dr. Kelly's prescriptions and the other Providing Providers' prescriptions of the Fraudulent Pharmaceuticals were based on predetermined protocols, Dr. Kelly and the other Prescribing Providers typically failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals prescribed to the patients and dispensed by Rego Park Pharmacy were actually used by the patients.

89.     Dr. Kelly and the other Prescribing Providers also typically failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals provided any pain relief to the patients or whether the patients experienced any side effects associated with the prescribed pharmaceutical product.

90.     At times, Dr. Kelly and the other Prescribing Providers failed to document in their examination reports that the patient even received a Fraudulent Pharmaceutical.

91.     The failure of Dr. Kelly and the other Prescribing Providers to properly document which Fraudulent Pharmaceuticals were prescribed to their patients and the patients' reactions to those pharmaceuticals demonstrates a complete disregard for patient health and safety.

92.     In keeping with the fact that the Pharmacy Defendants targeted a specific set of pharmaceuticals pursuant to collusive arrangements with Dr. Kelly, other Prescribing Providers, and the Clinic Controllers, and pursuant to fraudulent, predetermined and profit-driven treatment protocols without regard to genuine patient care, most of the more than 400 individual Insureds who treated with Dr. Kelly – despite their unique medical needs – were prescribed virtually

identical sets of pharmaceuticals during their first appointments, which were then filled by Rego Park Pharmacy.

93.     The identical sets of the pharmaceuticals prescribed by Dr. Kelly to patients during their first appointments typically consisted of Cyclobenzaprine, Ibuprofen and/or Naproxen, Lidocaine 5% Ointment, and Lidocaine 5% Patches.

94.     In keeping with the fact that the Pharmacy Defendants targeted a specific set of pharmaceuticals pursuant to collusive arrangements with Dr. Kelly, other Prescribing Providers, and the Clinic Controllers, and pursuant to fraudulent, predetermined and profit-driven treatment protocols without regard to genuine patient care, Dr. Kelly, in multiple instances, issued virtually identical prescriptions to multiple Insureds involved in a single motor vehicle accident, regardless of each of the Insureds' individual circumstances or actual injuries.

95.     For example:

(i)     On May 25, 2020, three Insureds, BM, BML and SB, were purportedly involved in the same underlying motor vehicle accident. Thereafter, BM, BML, and SB sought treatment with Metro Pain Specialists P.C. at a No-Fault Clinic located at 204-12 Hillside Avenue, Hollis, New York, and underwent initial examinations with Dr. Kelly. Incredibly, Dr. Kelly prescribed the exact same Fraudulent Pharmaceuticals to all three Insureds – including Lidocaine 5% Ointment, Lidocaine 5% Patches, Cyclobenzaprine, Esomeprazole, and Naproxen – despite each of BM's, BML's, and SB's individual circumstances or actual injuries. On June 5, 2020, Rego Park Pharmacy dispensed the Lidocaine 5% Ointment, Lidocaine 5% Patches, Cyclobenzaprine, Esomeprazole, and Naproxen to BM, BML, and SB pursuant to Dr. Kelly's prescriptions dated June 2, 2020.

(ii)    On November 10, 2020, two Insureds, GF and II, were purportedly involved in the same underlying motor vehicle accident. Thereafter, both GF and II sought treatment with Metro Pain Specialists, P.C. at a No-Fault Clinic located at 204-12 Hillside Avenue, Hollis, New York, and underwent initial examinations with Dr. Kelly. Incredibly, Dr. Kelly prescribed the exact same Fraudulent Pharmaceuticals to both Insureds – including Lidocaine 5% Ointment, Lidocaine 5% Patches, Cyclobenzaprine, and Ibuprofen – despite each of GF's and II's individual circumstances or actual injuries. On November 15, 2020, Rego Park Pharmacy dispensed the Lidocaine 5%

Ointment, Lidocaine 5% Patches, Cyclobenzaprine, and Ibuprofen to GF and II pursuant to Dr. Kelly's prescriptions dated November 13, 2020.

(iii)    On August 1, 2019, two Insureds, RC and AO, were purportedly involved in the same underlying motor vehicle accident. Thereafter, both RC and AO sought treatment with Metro Pain Specialists P.C. at a No-Fault Clinic located at 33-06 88th Street, Jackson Heights, New York, and underwent initial examinations with Dr. Kelly. Incredibly, Dr. Kelly prescribed the exact same Fraudulent Pharmaceuticals to both Insureds – including Lidocaine 5% Ointment, 1st Medx Lidocaine Patch, Cyclobenzaprine, and Ibuprofen – despite each of RC's and AO's individual circumstances or actual injuries. On August 8, 2019, Rego Park Pharmacy dispensed the Lidocaine 5% Ointment, 1st Medx Lidocaine Patch, Cyclobenzaprine, and Ibuprofen to RC and AO pursuant to Dr. Kelly's prescriptions dated August 6, 2019.

(iv)    On June 19, 2019, two Insureds, DB and MG, were purportedly involved in the same underlying motor vehicle accident. Thereafter, both DB and MG sought treatment with Metro Pain Specialists P.C. at a No-Fault Clinic located at 33-06 88th Street, Jackson Heights, New York, and underwent examinations with Dr. Kelly. Incredibly, Dr. Kelly prescribed the exact same Fraudulent Pharmaceuticals to both Insureds – including Lidocaine 5% Patches and Ibuprofen – despite each of DB's and MG's individual circumstances or actual injuries. On September 3, 2019, Rego Park Pharmacy dispensed the Lidocaine 5% Patches and Ibuprofen to DB and MG pursuant to Dr. Kelly's prescriptions dated September 3, 2019.

(v)    On July 25, 2019, two Insureds, TM and VV, were purportedly involved in the same underlying motor vehicle accident. Thereafter, both TM and VV sought treatment with Metro Pain Specialists P.C. at a No-Fault Clinic located at 204-12 Hillside Avenue, Hollis, New York, and underwent examinations with Dr. Kelly. Incredibly, Dr. Kelly prescribed the exact same Fraudulent Pharmaceuticals to both Insureds – including Lidocaine 5% Ointment, Cyclobenzaprine, and Ibuprofen – despite each of TM's and VV's individual circumstances or actual injuries. On August 1, 2029, Rego Park Pharmacy dispensed the including Lidocaine 5% Ointment, Cyclobenzaprine, and Ibuprofen to TM and VV pursuant to Dr. Kelly's prescriptions dated July 31, 2019.

96.    Further to the fact that the Fraudulent Pharmaceuticals were prescribed and dispensed without regard to genuine patient care to exploit patients for financial gain, in numerous instances, extended periods of time would pass between the date of the prescriptions purportedly

issued to patients by the Prescribing Providers for the Fraudulent Pharmaceuticals and the date that those patients purportedly received the Fraudulent Pharmaceuticals from Rego Park Pharmacy.

97.   For example:

(i)   An Insured named VS was purportedly involved in a motor vehicle accident on August 17, 2019. Thereafter, VS sought treatment with Metro Pain Specialists, P.C. at a No-Fault Clinic located at 33-06 88th Street, Jackson Heights, New York, and underwent examinations with Dr. Kelly. On March 5, 2020, Dr. Kelly purportedly issued a prescription for Lidocaine Patches and Cyclobenzaprine to be dispensed by Rego Park Pharmacy. On May 20, 2020, Rego Park Pharmacy purportedly dispensed the Lidocaine Patches, and Cyclobenzaprine to VS pursuant to Dr. Kelly's prescription – an entire 76 days after the prescription was purportedly written.

(ii)   An Insured named IC was purportedly involved in a motor vehicle accident on November 14, 2020. Thereafter, IC sought treatment with Metro Pain Specialists, P.C. at a No-Fault Clinic located at 204-12 Hillside Avenue, Hollis, New York, and underwent examinations with Dr. Kelly. On February 24, 2021, Dr. Kelly purportedly issued a prescription for Lidocaine 5% Ointment to be dispensed by Rego Park Pharmacy. On April 6, 2021, Rego Park Pharmacy purportedly dispensed the Lidocaine 5% Ointment to IC pursuant to Dr. Kelly's prescription – an entire 41 days after the prescription was purportedly written.

(iii)   An Insured named AK was purportedly involved in a motor vehicle accident on February 21, 2021. Thereafter, AK sought treatment with Metro Pain Specialists, P.C. at a No-Fault Clinic located at 204-12 Hillside Avenue, Hollis, New York, and underwent examinations with Dr. Kelly. On March 5, 2021, Dr. Kelly purportedly issued a prescription for Lidocaine 5% Ointment, Lidocaine Patches, Cyclobenzaprine, and Ibuprofen to be dispensed by Rego Park Pharmacy. On April 7, 2021, Rego Park Pharmacy purportedly dispensed the Lidocaine 5% Ointment, Lidocaine Patches, Cyclobenzaprine, and Ibuprofen to AK pursuant to Dr. Kelly's prescription – an entire 33 days after the prescription was purportedly written.

(iv)   An Insured named AF was purportedly involved in a motor vehicle accident on February 29, 2020. Thereafter, AF sought treatment with Metro Pain Specialists, P.C. at a No-Fault Clinic located at 204-12 Hillside Avenue, Hollis, New York, and underwent examinations with Dr. Kelly. On March 6, 2020, Dr. Kelly purportedly issued a prescription for Lidocaine 5% Ointment, Lidocaine Patches, Cyclobenzaprine, Esomeprazole, and Ibuprofen to be dispensed by Rego Park Pharmacy. On April 7, 2020, Rego Park Pharmacy purportedly dispensed the Lidocaine 5% Ointment, Lidocaine Patches, Cyclobenzaprine, Esomeprazole, and Ibuprofen to AF

pursuant to Dr. Kelly's prescription – an entire <u>32 days after</u> the prescription was purportedly written.

(v)     An Insured named JC was purportedly involved in a motor vehicle accident on December 27, 2019. Thereafter, JC sought treatment with Metro Pain Specialists, P.C. at a No-Fault Clinic located at 33-06 88th Street, Jackson Heights, New York, and underwent examinations with Dr. Kelly. On March 11, 2020, Dr. Kelly purportedly issued a prescription for Lidocaine 5% Ointment to be dispensed by Rego Park Pharmacy. On April 9, 2020, Rego Park Pharmacy purportedly dispensed the Lidocaine 5% Ointment to JC pursuant to Dr. Kelly's prescription – an entire <u>29 days after</u> the prescription was purportedly written.

(vi)    An Insured named LH was purportedly involved in a motor vehicle accident on April 6, 2020. Thereafter, LH sought treatment with Tri-borough NY Medical Practice P.C. at a No-Fault Clinic located at 409 Rockaway Avenue, Brooklyn, New York, and underwent examinations with Dr. Kelly. On June 7, 2021, Dr. Kelly purportedly issued a prescription for Lidocaine Patches to be dispensed by Rego Park Pharmacy. On June 30, 2021, Rego Park Pharmacy purportedly dispensed the Lidocaine Patches to LH pursuant to Dr. Kelly's prescription – an entire <u>23 days after</u> the prescription was purportedly written.

(vii)   An Insured named LFC was purportedly involved in a motor vehicle accident on May 22, 2020. Thereafter, LFC sought treatment with Maxim Orthopaedics, PLLC at a No-Fault Clinic located at 116-15 Queens Boulevard, Forest Hills, New York, and underwent examinations with Maxim Tyorkin, M.D. ("Dr. Tyorkin"). On September 9, 2020, Dr. Tyorkin purportedly issued a prescription for Cyclobenzaprine to be dispensed by Rego Park Pharmacy. On October 2, 2020, Rego Park Pharmacy purportedly dispensed the Cyclobenzaprine to LFC pursuant to Dr. Tyorkin's prescription – an entire <u>23 days after</u> the prescription was purportedly written.

(viii)  An Insured named LC was purportedly involved in a motor vehicle accident on August 30, 2019. Thereafter, LC sought treatment with Global Rehabilitation Medical P.C. at a No-Fault Clinic located at 97-01 66 Avenue, Rego Park, New York, and underwent examinations with Oleg Fuzaylov, M.D. ("Dr. Fuzaylov"). On September 10, 2020, Dr. Fuzaylov purportedly issued a prescription for Lidocaine 5% Ointment, Lidocaine Patches, and Cyclobenzaprine to be dispensed by Rego Park Pharmacy. On October 2, 2020, Rego Park Pharmacy purportedly dispensed the Lidocaine 5% Ointment, Lidocaine Patches, and Cyclobenzaprine to LC pursuant to Dr. Fuzaylov's prescription – an entire <u>22 days after</u> the prescription was purportedly written.

(ix)     An Insured named CB was purportedly involved in a motor vehicle accident on March 5, 2020. Thereafter, CB sought treatment with Metro Pain Specialists, P.C. at a No-Fault Clinic located at 204-12 Hillside Avenue, Hollis, New York, and underwent examinations with Dr. Kelly. On March 19, 2020, Dr. Kelly purportedly issued a prescription for Lidocaine 5% Ointment, Lidocaine Patches, Cyclobenzaprine, Esomeprazole, and Ibuprofen to be dispensed by Rego Park Pharmacy. On April 6, 2020, Rego Park Pharmacy purportedly dispensed the Lidocaine 5% Ointment, Lidocaine Patches, Cyclobenzaprine, Esomeprazole, and Ibuprofen to CB pursuant to Dr. Kelly's prescription – an entire <u>18 days after</u> the prescription was purportedly written.

(x)     An Insured named ES was purportedly involved in a motor vehicle accident on October 17, 2019. Thereafter, ES sought treatment with Metro Pain Specialists, P.C. at a No-Fault Clinic located at 204-12 Hillside Avenue, Hollis, New York, and underwent examinations with Dr. Kelly. On November 5, 2019, Dr. Kelly purportedly issued a prescription for Lidocaine 5% Ointment, Lidocaine Patches, Cyclobenzaprine, and Ibuprofen to be dispensed by Rego Park Pharmacy. On November 20, 2020, Rego Park Pharmacy purportedly dispensed the Lidocaine 5% Ointment, Lidocaine Patches, Cyclobenzaprine, and Ibuprofen to ES pursuant to Dr. Kelly's prescription – an entire <u>15 days after</u> the prescription was purportedly written.

98.     In addition, Dr. Kelly and the other Prescribing Providers often contemporaneously prescribed two or more Fraudulent Pharmaceuticals from the same therapeutic drug class (*e.g.*, Lidocaine 5% Patches and Lidocaine 5% Ointment) which is known as therapeutic duplication. Therapeutic duplication can cause adverse events to the patient and very often leads to emergency room visits because the use of more than one medication in the same therapeutic class of drugs exacerbates the possible adverse side effects.

99.     Each year in the United States, approximately 4.5 million ambulatory care visits and 100,000 deaths occur as a result of adverse drug reactions. A substantial number of these adverse drug reactions are the result of improper prescription practices associated with therapeutic duplication. <u>See</u>, Mathew Witry, PharmD, PhD, <u>Medication List Discrepancies and Therapeutic Duplications Among Dual Use Veterans</u>, Federal Practitioner, 14 (September 2016).

100.    Therapeutic duplication puts patients at greater risk of adverse drug reactions without providing any significant additional therapeutic benefit.

101.    In addition to routinely contemporaneously prescribing two or more Fraudulent Pharmaceuticals from the same therapeutic drug class constituting therapeutic duplication, Dr. Kelly and the other Prescribing Providers often contemporaneously prescribed the *maximum recommended dosages* of each of the Fraudulent Pharmaceuticals from the same therapeutic drug class.

102.    The United States Food and Drug Administration ("FDA") requires that certain prescriptions – including lidocaine prescriptions – contain a package insert indicating dosing recommendations and limitations in addition to excessive dosing risks.

103.    For example, the package insert for Lidocaine 5% Patches indicates that the recommended maximum daily dose is three patches applied simultaneously for 12 hours. Excessive dosing of Lidocaine 5% Patches could result in Lidocaine toxicity when lidocaine blood concentrations exceed 5 µg/mL. Additionally, when Lidocaine 5% Patches are used concomitantly with other products containing local anesthetic agents – such as Lidocaine 5% Ointment – the amount absorbed from all formulations must be considered.

104.    In the present case, Dr. Kelly and the other Prescribing Providers not only routinely contemporaneously prescribed Lidocaine 5% Patches and Lidocaine 5% Ointment constituting therapeutic duplication, but they also often contemporaneously prescribed the maximum recommended dosages for the Lidocaine 5% Patches, which, when used with the Lidocaine 5% Ointment, constituted excessive dosing and presented a risk of Lidocaine toxicity in their patients.

105.    Notwithstanding the foregoing, in several instances where Dr. Kelly and the other Prescribing Providers limited the recommended dosage of Lidocaine 5% Patches to less than three

patches per 12 hours, Rego Park Pharmacy actually *increased the dosing instructions to patients to three Lidocaine 5% Patches per 12 hours* without noting approval of any such change from the appropriate Prescribing Provider.

106.     In further keeping with the fact that the Fraudulent Pharmaceuticals dispensed by Rego Park Pharmacy were prescribed, dispensed, and billed pursuant to fraudulent, predetermined protocols and collusive arrangements with Dr. Kelly, other Prescribing Providers, and the Clinic Controllers to the detriment of patient health and safety, Dr. Kelly and other Prescribing Providers often engaged in improper prescription practices, including issuing multiple prescriptions for multiple Fraudulent Pharmaceuticals from the same therapeutic class on the same date of service to a single patient.

107.     For example:

(i)      An Insured named RP was purportedly involved in a motor vehicle accident on August 30, 2021. Thereafter, RP sought treatment with Tri-Borough NY Medical Practice P.C. at a No-Fault Clinic located at 204-12 Hillside Avenue, Hollis, New York. On August 31, 2021, RP underwent an initial examination with Dr. Kelly, who issued prescriptions for Lidocaine 5% Patches and Lidocaine 5% Ointment – two drug products from the same therapeutic class – as well as Cyclobenzaprine and Ibuprofen. On September 3, 2021, Rego Park Pharmacy dispensed and billed for the Lidocaine 5% Patches, Lidocaine 5% Ointment, Cyclobenzaprine, and Ibuprofen pursuant to Dr. Kelly's prescriptions dated August 31, 2021.

(ii)     An Insured named MH was purportedly involved in a motor vehicle accident on August 15, 2021. Thereafter, MH sought treatment with Tri-Borough NY Medical Practice P.C. at a No-Fault Clinic located at 204-12 Hillside Avenue, Hollis, New York. On August 17, 2021, MH underwent an initial examination with Dr. Kelly, who issued prescriptions for Lidocaine 5% Patches and Lidocaine 5% Ointment – two drug products from the same therapeutic class – as well as Ibuprofen. On August 26, 2021, Rego Park Pharmacy dispensed and billed for the Lidocaine 5% Patches, Lidocaine 5% Ointment, and Ibuprofen pursuant to Dr. Kelly's prescriptions dated August 26, 2021.

(iii)    An Insured named KB was purportedly involved in a motor vehicle accident on November 16, 2020. Thereafter, KB sought treatment with Metro Pain

Specialists P.C. at a No-Fault Clinic located at 204-12 Hillside Avenue, Hollis, New York. On December 1, 2020, KB underwent an initial examination with Dr. Kelly, who issued prescriptions for Lidocaine 5% Patches and Lidocaine 5% Ointment – two drug products from the same therapeutic class – as well as Cyclobenzaprine and Ibuprofen. On December 4, 2020, Rego Park Pharmacy dispensed and billed for the Lidocaine 5% Patches, Lidocaine 5% Ointment, Cyclobenzaprine, and Ibuprofen pursuant to Dr. Kelly's prescriptions dated December 2, 2020.

(iv)     An Insured named RR was purportedly involved in a motor vehicle accident on September 30, 2020. Thereafter, RR sought treatment with Metro Pain Specialists P.C. at a No-Fault Clinic located at 204-12 Hillside Avenue, Hollis, New York. On October 1, 2020, RR underwent an initial examination with Dr. Kelly, who issued prescriptions for Lidocaine 5% Patches and Lidocaine 5% Ointment – two drug products from the same therapeutic class – as well as Cyclobenzaprine and Ibuprofen. On October 7, 2020, Rego Park Pharmacy dispensed and billed for the Lidocaine 5% Patches, Lidocaine 5% Ointment, Cyclobenzaprine, and Ibuprofen pursuant to Dr. Kelly's prescriptions dated October 5, 2020.

(v)      An Insured named CB was purportedly involved in a motor vehicle accident on June 12, 2020. Thereafter, CB sought treatment with Metro Pain Specialists P.C. at a No-Fault Clinic located at 204-12 Hillside Avenue, Hollis, New York. On June 18, 2020, CB underwent an initial examination with Dr. Kelly, who issued prescriptions for Lidocaine 5% Patches and Lidocaine 5% Ointment – two drug products from the same therapeutic class – as well as Cyclobenzaprine, Esomeprazole, and Naproxen. On June 22, 2020, Rego Park Pharmacy dispensed and billed for the Lidocaine 5% Patches, Lidocaine 5% Ointment, Cyclobenzaprine, Esomeprazole, and Naproxen pursuant to Dr. Kelly's prescriptions dated June 22, 2020.

(vi)     An Insured named AB was purportedly involved in a motor vehicle accident on January 7, 2020. Thereafter, AB sought treatment with Metro Pain Specialists P.C. at a No-Fault Clinic located at 33-06 88th Street, Jackson Heights, New York. On January 8, 2020, AB underwent an initial examination with Dr. Kelly, who issued prescriptions for Lidocaine 5% Patches and Lidocaine 5% Ointment – two drug products from the same therapeutic class – as well as Cyclobenzaprine, Esomeprazole, and Ibuprofen. On January 10, 2020, Rego Park Pharmacy dispensed and billed for the Lidocaine 5% Patches, Lidocaine 5% Ointment, Cyclobenzaprine, Esomeprazole, and Ibuprofen pursuant to Dr. Kelly's prescriptions dated January 9, 2020.

(vii)    An Insured named AH was purportedly involved in a motor vehicle accident on February 17, 2020. Thereafter, AH sought treatment with Metro Pain Specialists P.C. at a No-Fault Clinic located at 204-12 Hillside Avenue,

Hollis, New York. On April 23, 2020, AH underwent an initial examination with Dr. Kelly, who issued prescriptions for Lidocaine 5% Patches and Lidocaine 5% Ointment – two drug products from the same therapeutic class. On April 27, 2020, Rego Park Pharmacy dispensed and billed for the Lidocaine 5% Patches and Lidocaine 5% Ointment pursuant to Dr. Kelly's prescriptions dated April 27, 2020.

(viii)   An Insured named AM was purportedly involved in a motor vehicle accident on October 7, 2019. Thereafter, AM sought treatment with Metro Pain Specialists P.C. at a No-Fault Clinic located at 204-12 Hillside Avenue, Hollis, New York. On October 22, 2019, AM underwent an initial examination with Dr. Kelly, who issued prescriptions for Lidocaine 5% Patches and Lidocaine 5% Ointment – two drug products from the same therapeutic class – as well as Cyclobenzaprine, Esomeprazole, and Naproxen. On October 23, 2019, Rego Park Pharmacy dispensed and billed for the Lidocaine 5% Patches, Lidocaine 5% Ointment, Cyclobenzaprine, Esomeprazole, and Naproxen pursuant to Dr. Kelly's prescriptions dated October 22, 2019.

(ix)   An Insured named CV was purportedly involved in a motor vehicle accident on October 3, 2019. Thereafter, CV sought treatment with Metro Pain Specialists P.C. at a No-Fault Clinic located at 204-12 Hillside Avenue, Hollis, New York. On October 8, 2019, CV underwent an initial examination with Dr. Kelly, who issued prescriptions for Ibuprofen and Naproxen – two drug products from the same therapeutic class – as well as Lidocaine 5% Patches, Cyclobenzaprine, and Esomeprazole. On October 10, 2019, Rego Park Pharmacy dispensed and billed for the Ibuprofen, Naproxen, Lidocaine 5% Patches, Cyclobenzaprine, and Esomeprazole pursuant to Dr. Kelly's prescriptions dated October 10, 2019.

(x)   An Insured named RE was purportedly involved in a motor vehicle accident on August 2, 2019. Thereafter, RE sought treatment with Global Rehabilitation Medical P.C. at a No-Fault Clinic located at 97-01 66th Avenue, Rego Park, New York. On August 5, 2019, RE underwent an initial examination with Dr. Fuzaylov, who issued prescriptions for Diclofenac 1.3% Patches and Meloxicam – two drug products from the same therapeutic class – as well as Lidocaine 5% Patches, Magnesium Oxide, and Methocarbamol. On August 5, 2019, Rego Park Pharmacy dispensed and billed for the Diclofenac 1.3% Patches, Meloxicam, Lidocaine 5% Patches, Magnesium Oxide, and Methocarbamol pursuant to Dr. Fuzaylov's prescriptions dated August 5, 2019.

108.   Not only are these practices clearly part of a fraudulent scheme designed to maximize profit, but they also pose a risk to – and show genuine disregard for – patient health and

safety as they constitute therapeutic duplication and increase the risk of adverse drug reactions to the patients subjected to them.

### C.    The Fraudulent Lidocaine Ointment Prescriptions

109.    In accordance with the fraudulent scheme discussed herein, Rego Park Pharmacy routinely billed GEICO for exorbitantly priced Fraudulent Topical Pain Products in the form of Lidocaine 5% Ointment pursuant to duplicitous prescriptions solicited from Dr. Kelly, other Prescribing Providers, and the Clinic Controllers, in exchange for kickbacks and other financial incentives.

110.    Lidocaine 5% Ointment is primarily indicated for temporary pain relief associated with minor burns and skin irritations such as sunburn, insect bites, poison ivy, poison oak, poison sumac abrasions of the skin, or as a topical anesthetic for minor procedures such as sutures or injections. Lidocaine does not penetrate the skin enough to treat deep musculoskeletal pain.

111.    Additionally, excessive dosage or short intervals between doses of Lidocaine 5% Ointment can cause serious adverse effects. Accordingly, patients should be instructed to strictly adhere to the recommended dosage, and a single application of Lidocaine 5% Ointment should not exceed 5 grams.

112.    Despite this, Dr. Kelly and the other Prescribing Providers never recommended Insureds first use OTC lidocaine ointments or lotions to treat the minor aches and pains which they sustained in fender-bender type motor vehicles accidents. Rather, pursuant to collusive financial arrangements and predetermined protocols, Dr. Kelly, the other Prescribing Providers, and the Clinic Controllers routinely prescribed or caused to be prescribed to Insureds, Lidocaine 5% Ointment and directed those prescriptions to Rego Park Pharmacy.

113.    Further, to the extent that topical lidocaine is effective for treating certain specific conditions, the Lidocaine 5% Ointment prescribed and dispensed by the Defendants is only marginally stronger or more effective than OTC 4% lidocaine, yet costs exponentially more. Rather than provide more conservative, cost-effective treatment, Dr. Kelly and the other Prescribing Providers – at the direction of the Pharmacy Defendants and Clinic Controllers, and in order to exploit the Insureds for financial gain – virtually never directed the Insureds to try OTC 4% lidocaine prior to prescribing the Lidocaine 5% Ointment.

114.    For example, Dr. Kelly and the Prescribing Providers never recommended Insureds first try readily available commercial products, such as Icy Hot Lidocaine, which contains 4% lidocaine and is available in a 2.7 ounce tube at most well-known pharmacy retailers, including Rite-Aid and Target, for advertised prices around $10.00 – a mere fraction of the cost of Lidocaine 5% Ointment.

115.    In keeping with the fact that the Pharmacy Defendants submitted fraudulent charges to GEICO pursuant to collusive agreements with Dr. Kelly and the Clinic Controllers, and pursuant to fraudulent, predetermined and profit-driven treatment protocols, the Lidocaine 5% Ointment prescriptions were often issued contemporaneously with oral medications, such as muscle relaxants and NSAIDs, some of which also have cost-effective OTC alternatives in more conservative strengths that are commercially readily available.

116.    For example:

(i)    An Insured named SH was purportedly involved in a motor vehicle accident on July 25, 2019. Thereafter, SH sought treatment with Metro Pain Specialists P.C. at a No-Fault Clinic located at 204-12 Hillside Avenue, Hollis, New York. On July 30, 2019, SH underwent an initial examination with Dr. Kelly, who issued prescriptions for Lidocaine 5% Ointment, Cyclobenzaprine, and Naproxen. On August 1, 2019, Rego Park Pharmacy dispensed and billed for the Lidocaine 5% Ointment, Cyclobenzaprine, and Naproxen pursuant to Dr. Kelly's prescriptions dated July 31, 2019.

Naproxen is available OTC in conservative strengths at most well-known pharmacy retailers, including CVS and Target, for advertised prices of less than $10.00.

(ii)     An Insured named SC was purportedly involved in a motor vehicle accident on January 31, 2021. Thereafter, SC sought treatment with Tri-Borough NY Medical Practice, P.C. at a No-Fault Clinic located at 409 Rockaway Avenue, Brooklyn, New York. On August 30, 2021, SC underwent a follow-up examination with Dr. Kelly, who issued prescriptions for Lidocaine 5% Ointment and Ibuprofen. On September 3, 2021, Rego Park Pharmacy dispensed and billed for the Lidocaine 5% Ointment and Ibuprofen pursuant to Dr. Kelly's prescriptions dated September 1, 2021. Ibuprofen is available OTC in conservative strengths at most well-known pharmacy retailers, including CVS and Target, for advertised prices of less than $10.00.

(iii)    An Insured named CS was purportedly involved in a motor vehicle accident on August 13, 2019. Thereafter, CS sought treatment with Metro Pain Specialists P.C. at a No-Fault Clinic located at 204-12 Hillside Avenue, Hollis, New York. On August 27, 2019, CS underwent an initial examination with Dr. Kelly, who issued prescriptions for Lidocaine 5% Ointment, Lidocaine 5% Patches, Cyclobenzaprine, and Ibuprofen. On August 29, 2019, Rego Park Pharmacy dispensed and billed for the Lidocaine 5% Ointment, Lidocaine 5% Patches, Cyclobenzaprine, and Ibuprofen pursuant to Dr. Kelly's prescriptions dated August 29, 2019. Ibuprofen is available OTC in conservative strengths at most well-known pharmacy retailers, including CVS and Target, for advertised prices of less than $10.00.

(iv)    An Insured named IB was purportedly involved in a motor vehicle accident on November 5, 2020. Thereafter, IB sought treatment with Metro Pain Specialists P.C. at a No-Fault Clinic located at 204-12 Hillside Avenue, Hollis, New York. On November 10, 2020, IB underwent an initial examination with Dr. Kelly, who issued prescriptions for Lidocaine 5% Ointment, Lidocaine 5% Patches, and Ibuprofen. On November 12, 2020, Rego Park Pharmacy dispensed and billed for the Lidocaine 5% Ointment, Lidocaine 5% Patches, and Ibuprofen pursuant to Dr. Kelly's prescriptions dated November 11, 2020. Ibuprofen is available OTC in conservative strengths at most well-known pharmacy retailers, including CVS and Target, for advertised prices of less than $10.00.

(v)     An Insured named EC was purportedly involved in a motor vehicle accident on August 21, 2019. Thereafter, EC sought treatment with Metro Pain Specialists P.C. at a No-Fault Clinic located at 204-12 Hillside Avenue, Hollis, New York. On August 22, 2019, EC underwent an initial examination with Dr. Kelly, who issued prescriptions for Lidocaine 5%

Ointment, Lidocaine 5% Patches, and Naproxen. On August 23, 2019, Rego Park Pharmacy dispensed and billed for the Lidocaine 5% Ointment, Lidocaine 5% Patches, and Naproxen pursuant to Dr. Kelly's prescriptions dated August 22, 2019. Naproxen is available OTC in conservative strengths at most well-known pharmacy retailers, including CVS and Target, for advertised prices of less than $10.00.

117.   As with the Lidocaine 5% Ointment, rather than provide more conservative, cost-effective treatment, Dr. Kelly and the other Prescribing Providers, at the direction of the Pharmacy Defendants and the Clinic Controllers – and in order to exploit the Insureds for financial gain – virtually never directed the Insureds to try the commercially readily available OTC oral NSAIDs prior to prescribing the more expensive oral NSAIDs in higher strengths.

118.   In keeping with the fact that Lidocaine 5% Ointment was prescribed and dispensed without regard for patient care and safety and pursuant to predetermined protocols, the initial examination reports prepared by Dr. Kelly and the other Prescribing Providers virtually never stated the medical basis for the prescriptions.

119.   In further keeping with the fact that Lidocaine 5% Ointment was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care, the follow-up examination reports prepared by Dr. Kelly and the other Prescribing Providers virtually never addressed whether the Lidocaine 5% Ointment provided any pain relief to the patient or to what degree it was otherwise effective for the purpose prescribed.

120.   The fact that Dr. Kelly and the other Prescribing Providers failed to properly document the prescriptions for Lidocaine 5% Ointment further indicates that there was no legitimate medical reason for the Lidocaine 5% Ointment prescriptions dispensed by Rego Park Pharmacy.

121.   To date, the Pharmacy Defendants have submitted more than $1 million in fraudulent claims to GEICO through Rego Park Pharmacy seeking reimbursement for Lidocaine

5% Ointment, typically billing between $1,224.04 and $1,528.80 for a single tube of Lidocaine 5% Ointment.

122.    Additionally, to date, the Pharmacy Defendants have submitted more than $90,000.00 in fraudulent claims to GEICO through Rego Park Pharmacy seeking reimbursement for other topical and oral NSAIDs, typically billing between $24.32 and $2,385.80 per prescription.

123.    As with the prescriptions for Lidocaine 5% Ointment, the initial examination reports prepared by Dr. Kelly and the other Prescribing Providers virtually never set forth the medical basis for the other topical and oral prescriptions. Likewise, the follow-up examination reports virtually never addressed whether the prescribed medications provided any pain relief to the patient or to what degree it was otherwise effective for the purpose prescribed.

### D.    Fraudulent Lidocaine Patches

124.    As a further part of their scheme, the Pharmacy Defendants routinely billed GEICO for exorbitantly priced pain patches in the form of Lidocaine 5% Patches ("Lidocaine Patches") pursuant to prescriptions solicited from Dr. Kelly, other Prescribing Providers, and the Clinic Controllers in exchange for kickbacks or other financial incentives.

125.    In keeping with the fact that the Pharmacy Defendants steered Dr. Kelly and the other Prescribing Providers to prescribe the Fraudulent Pharmaceuticals pursuant to predetermined protocols designed to maximize profits without regard for patient care, the Lidocaine Patches were routinely dispensed and billed at exorbitant charges despite the fact that there are other, less expensive, commercially available FDA-approved patches.

126.    Notably, topical pain patches in which the primary ingredient is lidocaine (*i.e.*, the Lidocaine Patches) are mainly used to treat *chronic post-herpetic neuropathic pain*, although

studies have shown that any relief these patches provide – beyond topical anesthetic relief – is more attributable to its placebo effect rather than the pharmacological action of patches themselves.

127.    In fact, while application of pain patches in which the primary ingredient is lidocaine provides sufficient absorption to cause an anesthetic effect, it is insufficient to produce a complete sensory block.

128.    Nevertheless, Dr. Kelly and the other Prescribing Providers routinely prescribed the Fraudulent Pain Patches to Insureds for sprain/strain injuries sustained in fender-bender type motor vehicle accidents.

129.    The Lidocaine Patches were routinely prescribed at the time of the initial examination – during the acute stages of the Insureds' pain symptoms.

130.    Like the prescriptions for Lidocaine 5% Ointment, Dr. Kelly and the other Prescribing Providers virtually never recommended Insureds first use OTC patches containing lidocaine – which are available to treat their often acute, minor sprain/strain injuries. Rather, pursuant to collusive arrangements and predetermined protocols, Dr. Kelly and the other Prescribing Providers routinely prescribed Insureds exorbitantly priced prescription Lidocaine Patches, which were dispensed by Rego Park Pharmacy.

131.    As with the prescriptions for the other Fraudulent Topical Pain Products, the initial examination reports prepared by Dr. Kelly and the other Prescribing Providers virtually never set forth the medical basis for the prescriptions. Likewise, the follow-up examination reports virtually never addressed whether the Lidocaine Patches prescribed provided any pain relief to the patient or were otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

132.    In keeping with the fact that the Defendants acted with gross indifference to patient care and safety, the patients were generally not instructed on the safe use, side effects or risks associated with the Lidocaine Patches. Moreover, despite these risks – as demonstrated in the claims examples throughout this Complaint – Dr. Kelly and the other Prescribing Providers regularly prescribed, and the Pharmacy Defendants regularly dispensed, Lidocaine Patches contemporaneously to other Fraudulent Pharmaceuticals.

133.    Rego Park Pharmacy typically billed GEICO between $229.64 and $678.92 for each prescription of Lidocaine Patches. To date, Rego Park Pharmacy has billed GEICO more than $590,000.00 for Lidocaine Patches alone.

**E.**    **The Exploiting of Patients for Financial Gain Through the Illegal, Collusive Arrangements Between the Pharmacy Defendants, Prescribing Providers and the Clinic Controllers**

134.    New York's statutory framework provides, among other things, that pharmacies and licensed medical professionals are prohibited from (i) "exercising undue influence" on a patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party, and (ii) "directly or indirectly" giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

135.    Here, the Pharmacy Defendants colluded with Dr. Kelly, the other Prescribing Providers, and the Clinic Controllers associated with various No-Fault Clinics which treat thousands of Insureds, to have Dr. Kelly and the other Prescribing Providers prescribe, or purport to prescribe, the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products, and direct those prescriptions to Rego Park Pharmacy so that the Pharmacy Defendants could bill GEICO for egregiously inflated sums.

136.    In furtherance of the scheme, Dr. Kelly and the other Prescribing Providers intentionally prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of No-Fault Clinics pursuant to the collusive arrangements and fraudulent predetermined protocols, and without regard to genuine patient care, without regard to cost and attention to fiscal responsibility, and often without regard to pharmacologic outcomes.

137.    The Pharmacy Defendants on occasion supplied the No-Fault Clinics and the Clinic Controllers with the Fraudulent Pharmaceuticals to steer Dr. Kelly and the other Prescribing Providers to prescribe the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics and direct those prescriptions to the Pharmacy Defendants.

138.    The purpose of the Pharmacy Defendants supplying the No-Fault Clinics and the Clinic Controllers with the Fraudulent Pharmaceuticals was so that Dr. Kelly and the other Prescribing Providers could repeatedly issue predetermined and/or unnecessary prescriptions for the exorbitantly priced Fraudulent Topical Pain Products that Rego Park Pharmacy "specialized" in dispensing in order to exploit the Insureds' No-Fault Benefits.

139.    The Pharmacy Defendants, in collusion with Dr. Kelly, the other Prescribing Providers, and the Clinic Controllers, made sure that the Insureds virtually never had the option to use a pharmacy of their own choosing, and instead ensured the prescriptions for the Fraudulent Pharmaceuticals were directed to Rego Park Pharmacy, notwithstanding that: (i) in many instances, the No-Fault Clinics and the patient themselves were located far from Rego Park Pharmacy in Rego Park, Queens; and (ii) there were countless other pharmacies located much closer to the No-Fault Clinics and the patients' residences.

140.    In many cases, Rego Park Pharmacy purported to mail or deliver the Fraudulent Pharmaceuticals directly to the Insureds' homes, without the patient ever receiving the actual

written prescription and without the patient knowing that they were to receive a Fraudulent Pharmaceutical.

141.   Alternatively, the Insureds were given the Fraudulent Pharmaceuticals directly by the Clinic Controllers or front desk staff at the various No-Fault Clinics, without ever seeing the actual prescription or, in many cases, not even knowing that they were to receive a Fraudulent Pharmaceutical.

142.   The Pharmacy Defendants, Dr. Kelly, the other Prescribing Providers, and the Clinic Controllers did not give the Insureds the option to identify a pharmacy of their choosing to ensure that the prescriptions were filled by Rego Park Pharmacy, and to ensure that the Defendants benefitted financially from the prescriptions.

143.   Dr. Kelly and the other Prescribing Providers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities and in protocol manner to their patients.

144.   Dr. Kelly, the other Prescribing Providers, and the Clinic Controllers had no legitimate reason to direct the prescriptions for the Fraudulent Pharmaceuticals to Rego Park Pharmacy rather than to a multitude of other pharmacies that were equally capable of dispensing the prescriptions and often more convenient to many of the patients.

145.   Dr. Kelly and the other Pharmacy Defendants had no legitimate reason to dispense, or purport to dispense, the Fraudulent Pharmaceuticals that were (i) often prescribed and dispensed without regard to pharmacologic outcomes; (ii) prescribed and dispensed with gross indifference to patient health, care and safety; (iii) prescribed and dispensed as a matter of course without any recommendation that patients first try OTC products; and (iv) prescribed and dispensed without any attention to cost and fiscal responsibility, because, among other things, all pharmacists in New

York are required to conduct a prospective drug review before each prescription is dispensed, which review shall include screening for therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

146.    The Defendants, including Dr. Kelly, the other Prescribing Providers, the Clinic Controllers, would have not engaged in the illegal, collusive arrangements with the Pharmacy Defendants in violation of New York law, including intentionally prescribing the Fraudulent Pharmaceuticals, and directing those prescriptions to Rego Park Pharmacy, unless they profited from their participation in the illegal scheme.

147.    But for the payment of kickbacks, or other financial incentives (such as continued employment at a No-Fault Clinic), Dr. Kelly and the other Prescribing Providers would not have prescribed the Fraudulent Pharmaceuticals, or the large volume of the Fraudulent Topical Pain Products, and the Clinic Controllers would not have directed the prescriptions to Rego Park Pharmacy.

148.    The Pharmacy Defendants, Dr. Kelly, the other Prescribing Providers, and the Clinic Controllers have affirmatively concealed the particular amounts paid for the kickbacks since such kickbacks are in violation of New York law.

149.    Nevertheless, based on the circumstances surrounding the illegal, collusive arrangements, the Pharmacy Defendants paid financial kickbacks or provided other financial incentives, and Dr. Kelly, the other Prescribing Providers, and the Clinic Controllers received financial kickbacks or other financial incentives, for each of the particular prescriptions for the Fraudulent Pharmaceuticals that were dispensed by Rego Park Pharmacy.

150.    Upon information and belief, the payments of kickbacks were made at or near the time the prescriptions were issued.

## IV.    The Fraudulent Billing the Pharmacy Defendants Submitted or Caused to be Submitted to GEICO

151.    Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") – unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged. Each NDC number has an assigned Average Wholesale Price ("AWP").

152.    Each NDC (and, thus, the AWP) for a particular prescription product differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained. The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

153.    Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee Schedule"), for each brand name drug (or ingredient included in a compounded product) a provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

154.    For each generic drug (or the ingredient included in a compounded product) the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

155.    AWP is defined by 12 N.Y.C.R.R. § 440.2(a) as:

> "[t]he average wholesale price of a prescription drug as provided in the most current release of the Red Book published by Thomson Reuters or Medi-Span Master Drug Database by Wolters Kluwer Health or any successor published, on the day a prescription drug is dispensed or other nationally recognized drug pricing index adopted by the Chair or Chair's designee."

156.    When a pharmacist bills for dispensing prescription drugs (including compounded products), it must bill based on the actual NDC number (and the assigned AWP) for that drug or compound drug ingredient. It cannot use the NDC of the same ingredient available from a different supplier and/or purchased in different quantities in order to inflate the assigned AWP.

157.    The Pharmacy Defendants solicited Dr. Kelly, the other Prescribing Providers, and the Clinic Controllers to provide them with voluminous prescriptions for the Fraudulent Pharmaceuticals so they could bill GEICO and other New York No-Fault insurers for the exorbitantly priced pharmaceutical products.

158.    The Pharmacy Defendants intentionally targeted the Fraudulent Topical Pain Products (*i.e.*, Lidocaine 5% Ointment and Lidocaine Patches) because the Pharmacy Defendants could readily buy these Fraudulent Topical Pain Products at a low cost but bill GEICO and other New York No-Fault insurers inflated amounts based on high AWPs or "list prices" so as to maximize their profits.

159.    The Pharmacy Defendants purported to provide the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products, directly to GEICO Insureds, and sought reimbursement directly from GEICO pursuant to executed "Assignment of Benefit" ("AOB") forms.

160.    In support of their charges, the Pharmacy Defendants typically submitted: (i) the prescriptions purportedly issued by Dr. Kelly or the other Prescribing Providers; (ii) a "No-Fault" form known as an NF-3 Form, which includes the purported NDC numbers, units, and corresponding charges for each drug product or ingredient; (iii) a delivery receipt which included the Insureds' demographics, the sate the prescription was purportedly delivered, and the

pharmaceutical product that was delivered and in what quantity; and (iv) the executed AOB assigning the Insureds' benefits to the Pharmacy Defendants.

161.    The NDC numbers listed on the NF-3 Forms submitted by the Pharmacy Defendants identify the assigned AWPs for each of the prescription drugs or compounded drug ingredients.

162.    However, the Pharmacy Defendants never submitted their wholesale purchase invoices demonstrating: (i) how much the Pharmacy Defendants actually paid the supplier for the Fraudulent Pharmaceuticals; and (ii) whether the Pharmacy Defendants actually purchased the Fraudulent Pharmaceuticals with the particular NDC number used in the billing, representing purchases from a particular supplier in a particular quantity.

163.    With respect to the Fraudulent Pharmaceuticals, the Pharmacy Defendants never actually paid the AWP of the products that they dispensed or purported to dispense, and in particular never paid the targeted and egregious AWP for the Fraudulent Topical Pain Products, because it is not a true representation of actual market price and is far above the actual acquisition cost of the drug products themselves.

164.    Nevertheless, the Pharmacy Defendants billed GEICO and other No-Fault insurers egregious amounts far surpassing their actual acquisition costs as well as the costs of a wide variety of other medications that are FDA-approved and proven effective.

**V.    The Pharmacy Defendants' Submission of Fraudulent NF-3 Forms to GEICO**

165.    To support the fraudulent charges, statutorily prescribed claim forms for No-Fault Benefits have been submitted to GEICO by and on behalf of Rego Park Pharmacy seeking payment for the pharmaceuticals for which it is ineligible to receive payment.

166.     These forms, including NF-3 forms, HCFA-1500 forms and other supporting records that the Pharmacy Defendants submitted or caused to be submitted to GEICO, were false and misleading in the following material respects:

(i)      the NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Fraudulent Pharmaceuticals were medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit patients for financial gain without regard for genuine patient care;

(ii)     the NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Pharmacy Defendants were in compliance with all material licensing requirements and, therefore, were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Pharmacy Defendants did not comply with all material licensing requirements in that the Pharmacy Defendants engaged in illegal, collusive relationships in which the Pharmacy Defendants steered Dr. Kelly, the other Prescribing Providers, and the Clinic Controllers to direct illegal, predetermined prescriptions for the Fraudulent Pharmaceuticals to Rego Park Pharmacy in exchange for the payment of unlawful kickbacks and other financial incentives;

(iii)    the NF-3 forms, HCFA-1500 forms, and other supporting records, uniformly mispresented to GEICO that the Pharmacy Defendants were in compliance with all material licensing requirements and, therefore, were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Pharmacy Defendants did not comply with all material licensing requirements in that the Pharmacy Defendants intentionally targeted a specific set of pharmaceutical products to dispense in large volumes to Insureds at exorbitant charges, in place of other effective, less costly pharmaceuticals; and

(iv)     the NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Pharmacy Defendants were in compliance with all material licensing requirements and, therefore, were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Pharmacy Defendants did not comply with all material licensing requirements in that they dispensed the Fraudulent Pharmaceuticals pursuant to illegal, invalid, and duplicitous prescriptions.

## VI.   The Pharmacy Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

167.    The Pharmacy Defendants are legally and ethically obligated to act honestly and with integrity in connection with the provision of pharmaceutical products to the Insureds and the billing they submit or cause to be submitted to GEICO seeking reimbursement for these products.

168.    To induce GEICO to promptly pay the charges for the Fraudulent Pharmaceuticals, the Pharmacy Defendants have gone to great lengths to systematically conceal their fraud.

169.    Specifically, the Pharmacy Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that: (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; and (ii) the Pharmacy Defendants were involved in collusive, kickback arrangements with Dr. Kelly, the other Prescribing Providers, and the Clinic Controllers designed to generate voluminous prescriptions solely to maximize the billing to GEICO and other New York insurance companies.

170.    The Pharmacy Defendants also billed for the Fraudulent Pharmaceuticals based on purported prescriptions from multiple Prescribing Providers operating from multiple No-Fault Clinics in order to reduce the amount of billing based on any single license, and further billed for multiple drug products, including various oral medications, in order to conceal the scheme to exploit the Insureds for financial gain.

171.    The billing and supporting documentation submitted by the Pharmacy Defendants for the Fraudulent Pharmaceuticals, when viewed in isolation, does not reveal its fraudulent nature.

172.    In accordance with the No-Fault Laws, GEICO takes steps to timely respond to all claims and to ensure that No-fault claim denial forms or requests for additional verification of No-fault claims are properly addressed and mailed in a timely manner.

173.    The Pharmacy Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full. In fact, the Pharmacy Defendants continue to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that Rego Park Pharmacy has been engaged in fraud.

174.    The Pharmacy Defendants' continued collection efforts through numerous, separate collection proceedings is an essential part of their fraudulent scheme since they know it is impractical for a No-Fault arbitrator or civil court judge in a single No-Fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large scale, complex fraud scheme involving the prescription and dispending of Fraudulent Pharmaceuticals to hundreds of patients across numerous different No-Fault Clinics located throughout the New York metropolitan area.

175.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents that were submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damage of at least $447,829.00 representing payments made to GEICO based upon the fraudulent charges submitted by the Pharmacy Defendants, which damages are to be trebled under 18 U.S.C. § 1962(c), et al. to approximately $1.3 million.

176.    Based upon the Pharmacy Defendants' material misrepresentations and other affirmative acts to conceal fraud from GEICO, GEICO did not discover and could not reasonably

have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## THE FIRST CLAIM FOR RELIEF
### Against Khaimov and Rego Park Pharmacy
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

177.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

178.    There is an actual case in controversy between GEICO and the Pharmacy Defendants regarding all pending claims submitted by Rego Park Pharmacy, amounting to more than $750,996.00 in fraudulent billing for the Fraudulent Pharmaceuticals that the Pharmacy Defendants submitted or caused to be submitted to GEICO through Rego Park Pharmacy.

179.    Rego Park Pharmacy has no right to receive payment for any pending bills submitted to GEICO because Rego Park Pharmacy billed for pharmaceutical products that were medically unnecessary and were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard to genuine patient care.

180.    Rego Park Pharmacy has no right to receive payment for any pending bills submitted to GEICO because the Pharmacy Defendants participated in illegal, collusive agreements in which the Pharmacy Defendants steered Dr. Kelly, the other Prescribing Providers, and the Clinic Controllers to prescribe and direct illegal, predetermined prescriptions for the Fraudulent Pharmaceuticals to Rego Park Pharmacy in exchange for unlawful kickbacks and other financial incentives.

181.    Rego Park Pharmacy has no right to receive payment for any pending bills submitted to GEICO because the Pharmacy Defendants intentionally targeted a specific set of pharmaceutical products (*i.e.*, the Fraudulent Topical Pain Products) that Rego Park Pharmacy

dispensed in large volumes to Insureds at exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.

182.    Rego Park Pharmacy has no right to receive payment for any pending bills submitted to GEICO because the Pharmacy Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals dispensed by Rego Park Pharmacy pursuant to illegal, invalid, and duplicitous prescriptions.

183.    The Defendants, including Rego Park Pharmacy, violated New York State regulatory licensing requirements, rendering the pharmacy ineligible to receive reimbursement for No-Fault Benefits.

184.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Rego Park Pharmacy and Khaimov have no right to receive payment for any pending bills submitted to GEICO.

### THE SECOND CLAIM FOR RELIEF
**Against Khaimov**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

185.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

186.    Rego Park Pharmacy is an ongoing "enterprise," as that term is defined in 18 U.S.C § 1961(4), that engages in activities which affect interstate commerce.

187.    Khaimov and John Doe Defendants "1" through "10" knowingly have conducted and/or participated, directly or indirectly, in the conduct of Rego Park Pharmacy's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of United States mail to submit or cause to be submitted

thousands of fraudulent charges for nearly two years, and continuous efforts to collect on those charges, seeking payments that Rego Park Pharmacy was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary and/or the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Pharmacy Defendants participated in illegal, collusive relationships in which the Pharmacy Defendants steered Dr. Kelly, the other Prescribing Providers, and the Clinic Controllers to prescribe and direct illegal predetermined prescriptions for the Fraudulent Pharmaceuticals to Rego Park Pharmacy in exchange for unlawful kickbacks and other financial incentives; (iii) the Pharmacy Defendants intentionally targeted a specific set of pharmaceuticals that they dispensed in large volumes to Insureds with exorbitant charges, in place, of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; and (iv) the billed-for services were the product of illegal, invalid, and duplicitous prescriptions. A sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

188.    Rego Park Pharmacy's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Khaimov and John Doe Defendants "1" through "10" operated Rego Park Pharmacy, inasmuch as Rego Park Pharmacy was never eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Rego Park Pharmacy to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Pharmacy

Defendants actively continue to attempt collection on the fraudulent billing submitted through Rego Park Pharmacy to the present day.

189.    Rego Park Pharmacy is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault" insurance system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals; and bill pursuant to predetermined fraudulent protocols solely to financially enrich the Defendants. These inherently unlawful acts are taken by Rego Park Pharmacy in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

190.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $447,829.00 pursuant to the fraudulent bills submitted by the Pharmacy Defendants through Rego Park Pharmacy.

191.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fee pursuant to 18 U.S.C. § 1961(4), any other relief the Court deems just and proper.

### THE THIRD CLAIM FOR RELIEF
**Against Khaimov and Rego Park Pharmacy**
**(Common Law Fraud)**

192.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

193.    The Pharmacy Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of Rego Park Pharmacy.

194.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary and properly billed when in fact the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) in every claim, the representation that Rego Park Pharmacy was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Pharmacy Defendants participated in illegal, collusive relationships in which the Pharmacy Defendants steered Dr. Kelly, the other Prescribing Providers, and the Clinic Controllers to prescribe and direct illegal, predetermined prescriptions for the Fraudulent Pharmaceuticals to Rego Park Pharmacy in exchange for unlawful kickbacks or other financial incentives; (iii) in every claim, the representation that Rego Park Pharmacy was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Pharmacy Defendants intentionally targeted a specific set of pharmaceutical products that they could dispense in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law of New York State regulatory and licensing requirements; and (iv) in every claim, the representation that Rego Park Pharmacy was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the billed-for services were the product of illegal, invalid, and duplicitous prescriptions, rendering the pharmacy ineligible reimbursement for No-Fault benefits.

195.     The Pharmacy Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Rego Park Pharmacy that were not compensable under the No-Fault Laws.

196.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $447,829.00 pursuant to the fraudulent bills submitted, or caused to be submitted, by the Pharmacy Defendants through Rego Park Pharmacy.

197.     The Pharmacy Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

198.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THE FOURTH CLAIM FOR RELIEF
### Against Khaimov and Rego Park Pharmacy
### (Unjust Enrichment)

199.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

200.     As set forth above, the Pharmacy Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

201.     When GEICO paid the bills and charges submitted by or on behalf of Rego Park Pharmacy for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

202.     The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted and profited from, as a result

of, among other things, the payments received and the receipt of kickback payments, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

203.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

204.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in any event no less than $447,829.00.

**THE FIFTH CLAIM FOR RELEIF**
**Against Dr. Kelly and John Doe Defendants Nos. "1" through "10"**
**(Aiding and Abetting Fraud)**

205.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

206.    Dr. Kelly and John Doe Defendants "1" through "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by the Pharmacy Defendants.

207.    The acts of Dr. Kelly in furtherance of the fraudulent scheme include knowingly purporting to prescribe the Fraudulent Pharmaceuticals in predetermined, protocol fashion, participating in illegal, collusive relationships with the Pharmacy Defendants to prescribe and direct illegal, predetermined prescriptions for the Fraudulent Pharmaceuticals to Rego Park Pharmacy, and permitting her name to be used in the billing, prescription records and treatment reports submitted in support of the Fraudulent Pharmaceuticals that were used solely to maximize profits without regard for genuine patient care.

208.    The conduct of Dr. Kelly in furtherance of the fraudulent scheme was significant and material, with approximately 96% of the more than $1.8 million in fraudulent billing submitted to GEICO by Rego Park Pharmacy attributable to prescriptions issued by Dr. Kelly.  Further, Dr. Kelly's conduct was necessary and critical to the success of the fraudulent scheme because without

her actions, there would be no opportunity for Rego Park Pharmacy submit billing for the Fraudulent Pharmaceuticals and to obtain the large payments from GEICO and other insurers.

209.    The acts of John Doe Defendants "1" through "10" in furtherance of the fraudulent scheme include knowingly participating in the implementation and facilitation of the predetermined protocols and the illegal, collusive agreements with Dr. Kelly and the other Prescribing Providers, wherein they prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals in exchange for kickbacks and other financial incentives from the Pharmacy Defendants.   The conduct of John Doe Defendants "1" through '10" in furtherance of the fraudulent scheme was significant and material.

210.    Dr. Kelly and John Doe Defendants "1" through "10" undertook the above wrongful acts and conduct knowing that the Pharmacy Defendants were engaged in a scheme to defraud GEICO and other New York automobile insurance companies that involved (i) engaging in unlawful kickback arrangements to generate large volumes of predetermined prescriptions for the Fraudulent Pharmaceuticals that could be directed to Rego Park Pharmacy; (iii) prescribing and dispensing Fraudulent Pharmaceuticals that were not medically necessary and were prescribed and dispensed without regard for genuine patient care; (iii) submitting billing from Rego Park Pharmacy to GEICO and other New York automobile insurance companies that was inflated as a result of her issuance of pre-determined, protocol prescriptions for expensive Fraudulent Pharmaceuticals that were designed solely to maximize profits; and (v) intentionally targeting a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that the Pharmacy Defendants could bill for at exorbitant prices despite the availability of over-the-counter and other effective, less costly pharmaceuticals that could have been prescribed and dispensed to the patients.

211.     Dr. Kelly and John Doe Defendants "1" through "10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Rego Park Pharmacy for medically unnecessary and illusory Fraudulent Pharmaceuticals that were not compensable under the No-Fault Laws.

212.     The conduct of Dr. Kelly and John Doe Defendants "1" through "10" caused GEICO to pay approximately $447,829.00 pursuant to the fraudulent bills that the Defendants submitted or caused to be submitted through Rego Park Pharmacy.

213.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages

214.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory damages from Dr. Kelly and John Doe Defendants "1" through "10" in an amount to be determined at trial, but in the approximate amount of $447,829.00, along with punitive damages, interest and costs, and any other relief the Court deems just and proper.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.  On the First Claim for Relief against Rego Park Pharmacy and Khaimov, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Defendants have no right to receive payment for any pending bills, amounting to at least $750,996.00 submitted to GEICO;

B.  On the Second Claim For Relief against Khaimov compensatory damages in favor of GEICO in an amount to be determined at trial but in no event less than $447,829.00, together with

treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

C. On the Third Claim For Relief against Khaimov and Rego Park Pharmacy, compensatory damages in favor of GEICO in an amount to be determined at trial but in no event less than $447,829.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

D. On the Fourth Claim for Relief against Khaimov and Rego Park Pharmacy, a recovery in favor of GEICO in an amount to be determined at trial but in no event less than $447,829.00, with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

E. On the Fifth Claim for Relief against Dr. Kelly and John Doe Defendants Nos. "1" through "10", compensatory damages in favor of GEICO in an amount to be determined at trial but in the approximate amount of $447,829.00, with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

Dated: Uniondale, New York
        September 13, 2022

RIVKIN RADLER LLP

By: _/s/ Michael A. Sirignano_
      Michael A. Sirignano (MS 5263)
      Barry I. Levy (BL 2190)
      Priscilla D. Kam (PK 1505)
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company GEICO General Insurance Company and GEICO Casualty Company*